*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0347p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ASSOCIATED BUILDERS & CONTRACTORS, SAGINAW
VALLEY AREA CHAPTER, et al.,
          *Plaintiffs-Appellees/Cross-Appellants,*

*v.*

MICHIGAN DEPARTMENT OF LABOR AND ECONOMIC
GROWTH, et al.,
          *Defendants-Appellants/Cross-Appellees.*

Nos. 07-1639/1649/1654

---

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 91-10373—Thomas L. Ludington, District Judge.

Argued: July 23, 2008

Decided and Filed: September 16, 2008

Before: SUTTON and COOK, Circuit Judges; ROSE, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Dennis Raterink, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, John R. Canzano, KLIMIST, McKNIGHT, SALE, McCLOW & CANZANO, Southfield, Michigan, for Appellants. David John Masud, MASUD, PATTERSON, SCHUTTER, PETERS & VARY, Saginaw, Michigan, for Appellees. **ON BRIEF:** Dennis Raterink, Richard P. Gartner, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, John R. Canzano, KLIMIST, McKNIGHT, SALE, McCLOW & CANZANO, Southfield, Michigan, for Appellants. David John Masud, Katherine S. Gardner, MASUD, PATTERSON, SCHUTTER, PETERS & VARY, Saginaw, Michigan, for Appellees.

---

**OPINION**

---

    SUTTON, Circuit Judge. "This is another Employee Retirement Income Security Act of 1974 (ERISA) pre-emption case," *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 808 (1997), one that asks whether ERISA preempts two provisions of a Michigan law

---

[*]The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

governing the training of apprentice electricians. Because "the substantive standards to be applied to apprenticeship training programs are . . . quite remote from the areas with which ERISA is expressly concerned," and because of "the paucity of indication in ERISA and its legislative history of any intent on the part of Congress to pre-empt state apprenticeship training standards," *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 330–31 (1997), we hold that ERISA does not preempt the provisions.

I.

In 1990, the Michigan legislature imposed two requirements on the training and supervision of apprentice electricians. It required there to be a one-to-one ratio between trained electricians and apprentice electricians at all work sites. *See* Mich. Comp. Laws § 338.883e(3). And it established an "equivalency requirement" for the Michigan Electrical Administrative Board, which meant that individuals could be certified in an apprenticeship training program only if the program met the apprentice-training requirements imposed by the U.S. Department of Labor Bureau of Apprenticeship and Training. *See id.* § 338.883e(2).

In 1991, Associated Builders & Contractors, a trade organization, together with three of its members (collectively, "Associated Builders") filed this action against a state agency and its director (collectively, the "State"), claiming that ERISA preempted the ratio and equivalency requirements. The district court agreed and ordered the State to refrain from enforcing the requirements. *Associated Builders & Contractors v. Perry*, 817 F. Supp. 49, 54 (E.D. Mich. 1992). The State did not appeal the decision. (When an intervening trade association appealed the decision, we dismissed the appeal for lack of standing. *See Associated Builders & Contractors v. Perry*, 16 F.3d 688, 689 (6th Cir. 1994).)

Fourteen years later, in 2006, Michigan filed a motion under Rule 60(b)(5) of the Federal Rules of Civil Procedure to dissolve the 1992 injunction, claiming that intervening Supreme Court decisions had swept away the legal premises of the order. Associated Builders responded that the motion was untimely and lacked merit to boot. The district court concluded that the State had filed the motion within a reasonable time and revisited the merits of the 1992 decision. But it ultimately denied the State's request for relief, concluding that, even though the relevant case law had changed in the intervening years, ERISA continues to preempt each of the two apprentice-training requirements.

II.

Associated Builders, as an initial point of dispute, argues that the State's Rule 60(b)(5) motion was untimely and thus should never have been considered on the merits in the first place. This aspect of the district court's decision receives abuse-of-discretion review. *See Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir. 2006).

Under Rule 60(b)(5) of the Federal Rules of Civil Procedure, a court may dissolve an injunction if it "is based on an earlier judgment that has been reversed or vacated" or if applying the injunction prospectively "is no longer equitable." One predicate for altering an injunction or consent decree under the rule is a change in law—new court decisions or statutes that make legal what once had been illegal. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 388 (1992); *Sys. Fed'n No. 91, Ry. Employes' Dept., AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994) (en banc).

A party bringing a Rule 60(b)(5) motion must do so "within a reasonable time," Fed. R. Civ. P. 60(c)(1), a requirement that turns on the length of the delay, the explanations for the delay, the prejudice to the opposing party caused by the delay and the circumstances warranting relief. *See In re G.A.D., Inc.*, 340 F.3d 331, 334 (6th Cir. 2003). Also relevant is the nature of the dispute and

whether it involves a purely private disagreement or a matter of public interest. "[T]he public interest is a particularly significant reason for applying a flexible modification standard" because injunctions often "reach beyond the parties involved directly in the suit and impact the public's right to the sound and efficient operation of its [government]." *Rufo*, 502 U.S. at 381 (internal quotation marks omitted).

The district court did not abuse its discretion in determining that the State filed its motion within a reasonable time. *One*, there has been a change in law. Ignoring for a moment the potential significance of *when* ERISA-preemption law changed—whether in 1997, as Associated Builders urges, *see* Fourth Br. at 4, or as late as 2004, as the State urges, *see* Third Br. at 5 & n.6—the fact remains that the law "has changed so that the enjoined behavior, which once might have been [preempted by] federal law, [may] no longer [be preempted] at all," *Sweeton*, 27 F.3d at 1166 (emphasis omitted). In *De Buono*, 520 U.S. at 813, the Supreme Court itself acknowledged differences between the Court's "earlier ERISA pre-emption cases" and its cases since *New York State Conference of Blue Cross & Blue Shield v. Travelers Insurance Co.*, 514 U.S. 645 (1995), and so have the lower courts, *see, e.g.*, *S. Cal. IBEW-NECA Trust Funds v. Standard Indus. Elec. Co.*, 247 F.3d 920, 927 (9th Cir. 2001); *Willmar Elec. Serv., Inc. v. Cooke*, 212 F.3d 533, 537 (10th Cir. 2000).

*Two*, this case plainly implicates a matter of public concern—a State's police-power interest in regulating the safety and training of new apprentice electricians—not simply a dispute between two private citizens. A court should not lightly deny a State's request to regulate a matter of public safety, particularly when the obstacle to the regulation rests on a legal foundation that may no longer be sound.

*Three*, while one could imagine a State responding more quickly to these changes in the law than Michigan did, there are practical reasons for excusing the delay. The district court issued the underlying injunction in 1992, and the first Supreme Court decisions suggesting a new way of viewing ERISA preemption cases came in 1997 when the Court decided *Travelers*, *De Buono* and *Dillingham.* But even the most sophisticated reader of ERISA case law could not claim with a straight face that a red light on regulating apprentice training before 1992 suddenly became green after 1997. In construing the "relate to" scope of preemption, the pre-1992 cases are as context-specific and as short on bright-line guidance as the post-1997 cases. Far from announcing a brave new line for ascertaining ERISA preemption, the post-1997 cases show only a willingness to place more emphasis on the presumption against preemption and on the underlying purposes of the ERISA statute—both of which give the States wider, but hardly unreviewable, berth in regulating the area. The last thing, indeed, that a purpose-driven approach to statutory construction guarantees is clarity. The key effect of permitting judges to generalize from the purposes of a statute, as opposed to just its text, is to give them more rather than less discretion in construing a law's scope.

Even today, the question whether ERISA preempts these laws is not an easy one. When Congress passes a law that is as plausibly and implausibly preemptive of a wide range of state laws as ERISA's "relate to" clause and when the courts understandably struggle to place state laws on one side or the other of the line, there is little reason to construe the "reasonable time" limitation in Rule 60 as a rigid statute of limitations. An unduly strict reading of the reasonable-time requirement, moreover, would tend to force premature Rule 60(b)(5) motions due to a State's fear of losing forever the opportunity to correct an injunction or consent decree. In the aftermath of the 1997 decisions, at any rate, state lawyers may well have questioned whether the cases ushered in a materially different view of ERISA preemption, or elected leaders in the legislative or executive branches in office in 1997 may not have agreed with the regulatory objectives of the laws preempted by the 1992 decision and therefore would have had no reason to ask the court to revisit the validity of its decision.

*Four*, Associated Builders has not pointed to any prejudice that the alleged delay caused it to suffer. The lapse in time gave the association and its members more time to be free of these allegedly burdensome regulations and more time for all concerned to see how other courts construed the 1997 Supreme Court ERISA decisions. All things considered, the district court did not abuse its discretion in accepting this Rule 60(b)(5) motion and in reaching the merits of the State's ERISA arguments.

III.

Does ERISA, as construed by the Supreme Court, require us to dissolve the injunction prohibiting enforcement of these two Michigan laws? Yes, and accordingly the State may now enforce them.

ERISA by its terms preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The statute defines an "employee benefit plan" as

> any plan, fund, or program . . . established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, *apprenticeship or other training programs*, or day care centers, scholarship funds, or prepaid legal services. . . .

*Id.* § 1002(1) (emphasis added); *see also id.* § 1002(3). While the "relate to" clause might at first glance seem to have an horizonless reach, *Travelers* counsels that "infinite relations cannot be the measure of pre-emption." 514 U.S. at 656. In ascertaining what state laws "relate to" ERISA-defined plans, *Travelers* tells us to "look . . . to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.*

Of particular relevance to today's dispute, *Dillingham* applied this text and *Travelers*' construction of it to a state law regulating apprentices. At stake was the validity of a California statute that required contractors who were awarded state public-works projects to pay their apprentices the local prevailing wage, unless the State had approved the apprenticeship program, in which case the contractors could pay a lower rate. 519 U.S. at 319. A law "relates to" an ERISA plan, the Court explained, if it has a "reference to" or a "connection with" a plan. *Id.* at 324. The law did not "refer[] to" an ERISA plan because it applied equally to training programs funded by a separate ERISA fund and those funded out of an employer's general assets. *Id.* at 328. Because the California law affected ERISA and non-ERISA plans alike, it did not "refer to" a plan. *Id.*

In holding that the law did not have a "connection with" an ERISA plan, the Court began "with the presumption that ERISA did not intend to supplant it," *id.* at 332, because "apprenticeship standards and the wages to be paid on public works have long been regulated by the States," *id.* at 330. It then reasoned that the California statute merely "alter[ed] the incentives, but d[id] not dictate the choices, facing ERISA plans." *Id.* at 334. Because contractors with apprenticeship programs could escape the statute's requirements by opting not to work on state public-works projects or by paying their apprentices the local prevailing wage, the statute did not "mandate[] employee benefit structures or their administration." *Id.* at 328 (internal quotation marks omitted). The law "merely . . . provide[d] . . . economic incentive[s]" to comply with the state law, which does not suffice to preempt it. *Id.* at 332.

In holding that ERISA did not preempt California's prevailing-wage law because it was optional, however, *Dillingham* did not draw the dispositive preemption line between laws that

mandate something that potentially affects an ERISA plan and those that mandate nothing. The key distinction is between a statute that mandates or effectively mandates an aspect of law with which ERISA is concerned—i.e., a statute that mandates "employee benefit structures or their administration"—and a statute that does not. *See id.* at 328–34; *see also Air Transp. Ass'n of Am. v. City and County of San Francisco*, 266 F.3d 1064, 1071 (9th Cir. 2001). Illustrating the point, *De Buono* held that ERISA did not preempt a state gross receipts tax imposed on all hospitals in a State, including hospitals operated by ERISA plans, because the statute was "one of myriad state laws of general applicability that impose some burdens on the administration of ERISA plans but nevertheless do not 'relate to' them within the meaning of the governing statute." 520 U.S. at 815 (internal quotation marks omitted). What is true of a general state tax is true of many other general state mandates that affect ERISA plans: They may "increase[] the cost of providing benefits to covered employees" and they may "have some effect on the administration of ERISA plans, but that simply cannot mean that every state law with such an effect is pre-empted by the federal statute." *Id.* at 816.

Other cases, including *Dillingham* itself, support this distinction. *See* 519 U.S. at 328 (a statute that "mandate[s] employee benefit structures or their administration" satisfies the "connection with" test) (internal quotation marks omitted); *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001) (ERISA preempts a statute that "binds ERISA plan administrators to a particular choice of rules for determining beneficiary status"); *De Buono*, 520 U.S. at 816 n.16 ("[T]here might be a state law whose economic effects . . . were so acute as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers and such a state law might indeed be pre-empted [by ERISA].") (internal quotation marks omitted); *Travelers*, 514 U.S. at 658 ("In each of these cases, ERISA pre-empted state laws that mandated employee benefit structures or their administration."); *Retail Indus. Leaders Assoc. v. Fielder*, 475 F.3d 180, 192–93 (4th Cir. 2007) ("[A] state law has an impermissible 'connection with' an ERISA plan if it directly regulates or effectively mandates some element of the structure or administration of employers' ERISA plans.").

The "connection with" inquiry thus requires two showings to preempt a state law: (1) the law at issue must mandate (or effectively mandate) something, and (2) that mandate must fall within the area that Congress intended ERISA to control exclusively. *Cf. Dillingham*, 519 U.S. at 325 (looking "both to the objectives of the ERISA statute" and to the "*nature* of the effect of the state law on ERISA plans") (emphasis added and internal quotation marks omitted). Compulsion in other words is a necessary, but not a sufficient, condition for ERISA preemption. With these principles in mind, we turn to whether ERISA preempts Michigan's ratio and equivalency requirements.

IV.

The parties share some common ground in applying these lessons to Michigan's law. They agree that ERISA applies to Associated Builders' apprenticeship programs because the programs are funded through separate funds, not out of the employers' general assets. *See Dillingham*, 519 U.S. at 326. And they agree that the ratio and equivalency requirements do not have a "reference to" ERISA plans: The rules do not "act[] immediately and exclusively upon ERISA plans" and thus do not depend on "the existence of ERISA plans [for their] . . . operation." *Id.* at 325. What separates the parties is whether the requirements have a "connection with" an ERISA plan—specifically (1) whether the state laws impose mandates on the training programs and (2) whether those mandates affect ERISA-regulated concerns.

A.

The ratio and equivalency rules plainly contain mandates. The ratio requirement provides that all apprentice electricians working in Michigan must register with the State's electrical administrative board and that the ratio of electrical journeymen or master electricians to registered-

apprentice electricians at a job site must be one-to-one. The equivalency requirement provides that all apprentice electricians working in the State must participate in a training program approved by the board—i.e., a program with requirements "equivalent" to those imposed by the U.S. Department of Labor Bureau of Apprenticeship and Training. The U.S. Department of Labor, through the Fitzgerald Act regulations, in turn requires: a written apprenticeship agreement; a term of apprenticeship of not less than 2,000 hours; an outline of tasks in which the apprentice will receive supervised work experience; a numeric ratio of apprentices to journeymen consistent with proper supervision, training and safety; a schedule of wages; adequate and safe equipment and facilities for training and supervision; and the assurance of qualified training personnel. *See* 29 C.F.R. § 29.5.

Unlike the statute in *Dillingham*, which merely offered an incentive to some apprenticeship programs, Michigan's statute imposes requirements on all apprenticeship programs. And nothing short of discharging all of its apprentices will release an employer or a program from the reach of the Michigan statute.

B.

Because the Michigan rules plainly mandate something, the question is whether that something falls within the scope of issues that ERISA prohibits the States from regulating. We think not for several reasons.

*First*, no one disputes that the States have long regulated apprenticeship standards and training or that this topic of regulation falls well within their traditional police powers. *See Dillingham*, 519 U.S. at 330–32. We therefore start with the presumption that Michigan's requirements fall outside of ERISA's preemptive reach. *Id.*

*Second*, the policies underlying the ratio and equivalency rules—the safety of electrical apprentices and appropriate standards of electrical apprenticeship—are "quite remote from the areas with which ERISA is expressly concerned." *Id.* at 330. ERISA "has nothing to say" about "the standards to be applied to apprenticeship training programs," and neither "ERISA [nor] its legislative history [evinces] any intent on the part of Congress to pre-empt state apprenticeship training standards." *Id.* at 330–31.

*Third*, what triggers ERISA's potential application to these laws is not the existence of an apprenticeship training program, *see id.* at 326, but the existence of a separate fund to support the training program. Yet the allegedly preempted laws concern substantive apprenticeship training standards, not matters directly related to the fund, prompting us to wonder why Congress would want the States' public-safety authority to regulate substantive apprenticeship training standards to turn on how those plans are financed. We do not have an answer, and neither, so far as we can tell, does Associated Builders.

*Fourth*, under Associated Builders' theory, ERISA would prevent the States from regulating the safety of apprentices and the standards of electrical apprenticeship, even though ERISA does not regulate these matters either. And the Fitzgerald Act, which regulates just some of these issues, specifically allows and encourages what Michigan has done—most notably its adoption of some of the federal rules, a policy choice that generally will have a tendency to further nationwide uniformity rather than undermine it. Federal preemption, true enough, may in some settings further a regulatory vacuum that allows market forces to play out. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378–89 (1992). But no one maintains that ERISA—a law that hardly comes to mind as one encouraging market-based solutions—is that kind of statute, particularly as it relates to substantive apprenticeship training standards.

In authorizing the Secretary of Labor to "cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship" and to "promote the furtherance of labor

standards necessary to safeguard the welfare of apprentices," 29 U.S.C. § 50, the Fitzgerald Act also undermines any suggestion that Congress sees no role for the States in regulating apprenticeship safety. The Act, indeed, suggests a direct role for the States in regulating those areas—a point of particular relevance because the same Congress that passed ERISA also amended the Fitzgerald Act to its current form. *See* Pub. L. No. 93-198, 87 Stat. 784 (1973). Just as the existence and continued enforcement of the two federal laws suggest a distinction between "the areas with which ERISA is expressly concerned" (i.e., "reporting, disclosure, fiduciary responsibility, and the like"), *Dillingham*, 519 U.S. at 330 (internal quotation marks omitted), and the areas with which the Fitzgerald Act is concerned (the safety of apprentices and the standards of apprenticeship), so they suggest that there is a distinction between ERISA's concerns and the Michigan apprenticeship rules' concerns.

*Travelers* reinforces the point. The Court reasoned that preemption of the New York statute at issue was particularly inappropriate because Congress, through the National Health Planning and Resources Development Act of 1974 (NHPRDA), Pub. L. No. 93-641, 88 Stat. 2225, had "sought to encourage" precisely what New York was attempting to accomplish through its statute, *Travelers*, 514 U.S. at 665. Yet by construing ERISA to preempt the state law, the Court "would have rendered the entire NHPRDA utterly nugatory, since it would have left States without the authority to do just what Congress was expressly trying to induce them to do by enacting the NHPRDA." *Id.* at 667. A similar problem exists here: By construing ERISA to preempt Michigan's ratio and equivalency requirements, which embrace some of the Fitzgerald Act's apprenticeship requirements as the State's own, the court would hardly "promote the furtherance of labor standards necessary to safeguard the welfare of apprentices" and might well undermine the Secretary's ability "to cooperate with State agencies" and to "extend the application of [apprenticeship] standards." 29 U.S.C. § 50. "It is not," to be sure, "inconceivable for the ERISA Congress to intend the pre-emption of state statutes resulting from the pre-existing Fitzgerald Act," but the Fitzgerald Act and the analogy to *Travelers* do "aid our conclusion that Congress' silence on the pre-emption of state statutes that Congress previously sought to foster counsels against pre-emption here." *Dillingham*, 519 U.S. at 331 n.7.

*Fifth*, were it otherwise, ERISA might preempt all sorts of laws of general applicability that affect ERISA plans, a view that would preempt a slew of state laws regulating not just apprenticeship standards but also the medical profession, day care centers and the practice of law. *See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan" to include, among other things, a plan, fund or program established for the purpose of providing its participants "medical, surgical, or hospital care or benefits, . . . day care centers . . . or prepaid legal services"); *see also Travelers*, 514 U.S. at 661. Yet "[t]he bigger the package of regulation with indirect effects [on ERISA plans] that would fall on the respondents' reading of [ERISA's preemption provision], the less likely it is that federal regulation of benefit plans was intended to eliminate state regulation of [the area]." *Travelers*, 514 U.S. at 661. No one seriously contends that Congress intended ERISA to preempt state laws that, say, permit only licensed physicians to perform certain medical procedures, *see, e.g.*, Mich. Comp. Laws § 333.17018, or state laws that require a person certified in CPR to be on duty when a day care center is providing care to a child, *see, e.g.*, *id.* § 722.112a, even though such statutes contain mandates affecting ERISA plans and thereby increase the cost of providing certain employee benefits. ERISA unsurprisingly has nothing to say about those matters—particularly when, as is normally the case, the hospital or day care center is not affiliated with an ERISA plan. *Cf. Travelers*, 514 U.S. at 661 ("[N]othing in the language of [ERISA] or the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern."); *Retail Indus.*, 475 F.3d at 191 ("States continue to enjoy wide latitude to regulate healthcare *providers*."). While a party might well wish to create a state-law-free zone around everything that affects an ERISA plan, "pre-emption does not occur if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." *Travelers*, 514 U.S. at 661 (internal quotation marks and alterations omitted).

What makes Associated Builders' approach particularly odd is the freedom it would give employers to escape generally applicable state laws that have nothing to do with ERISA's concerns. If, for instance, an employer wanted to avoid the higher costs associated with using only licensed physicians and lawyers to perform medical and prepaid-legal services for its employees, it simply could create an ERISA plan to pay for those services, then invoke ERISA preemption to duck responsibility for complying with the state laws. Indeed, the Minnesota Chapter of Associated Builders has figured out this perceived loophole: Its "promotional materials noted that if companies joined the foundation and paid for employee apprenticeship classroom training through a foundation trust account, they may be able to establish an ERISA plan and thereby be 'exempt from [supervision] ratios imposed by state and/or local governments.'" *Wright Elec., Inc. v. Minn. State Bd. of Elec.*, 322 F.3d 1025, 1027 (8th Cir. 2003) (alteration in original).

*Sixth*, we have some company in reaching this conclusion, at least with regard to the ratio requirement. In *Willmar Electric*, the Tenth Circuit concluded that ERISA did not preempt "a Colorado statute requiring apprentices performing electrical work in Colorado to be supervised on a one-to-one basis by licensed journeyman electricians." 212 F.3d at 534. In reaching that conclusion, the court reasoned that "[t]he subject of the Colorado law, like the California statute in *Dillingham*, is outside the area of ERISA's concerns" and that "*Dillingham* is particularly instructive here insofar as it suggests that ERISA's objectives are not interfered with by state regulation of substantive apprenticeship training standards." *Id*. at 537–58. The court also explained that, although the

> supervision standards may have some effect on [the] administration of [the plaintiff's] benefit plan, . . . this is [not] enough to overcome the presumption that Congress did not intend to supersede state regulation of this area of law. A similar effect on uniform plan administration would assuredly arise from the apprenticeship wage law in *Dillingham* and the state tax at issue in *DeBuono*, but the Supreme Court found no grounds for preemption in those cases.

*Id.* at 539. The Eighth Circuit reached the same conclusion in *Wright Electric*, agreeing with the Tenth Circuit that it is "implausible that Congress could have intended for such a regulation to be superseded by ERISA because its application has some impact on an ERISA plan." 322 F.3d at 1032 (internal quotation marks omitted).

That leads to one potential obstacle to this approach—at least with respect to the equivalency rules. In *Minnesota Chapter of Associated Builders and Contractors, Inc. v. Minnesota Department of Public Safety*, 267 F.3d 807 (8th Cir. 2001), the Eighth Circuit held that ERISA preempts a Minnesota statute that resembles Michigan's equivalency requirement and that "required apprentices to be actively enrolled in a registered apprenticeship program and registered with a federal or state agency that approved apprenticeship programs," *id.* at 809. We are not, however, persuaded by its reasoning.

The lynchpin of the court's conclusion was its belief that Minnesota's statute, unlike the ratio requirement in *Willmar* or the wage requirement in *Dillingham*, did more than "indirectly increase the cost of the apprenticeship training"; it served "to actually prevent training [because a] fire protection contractor working in Minnesota [could not] hire an apprentice from an unapproved program." *Id.* at 815 (emphasis in original). There are two problems with this reasoning. The first is that neither Minnesota's statute nor Michigan's statute prevents training; they prevent only certain types of training. The second is that, while the Michigan statute does prevent some methods of apprenticeship training, that does not mean that the law is preempted. To be sure, the Michigan law prevents some forms of training for the basic reason that the State does not want training that may result in injuries, overworking or shabby electrical work. But the question, as we have shown, is whether the statute mandates something with which ERISA is concerned, not simply whether it

contains a mandate. *Cf. id.* at 820–21 (Bye, J., dissenting) (stating that the majority's view "reflects a more expansive view of ERISA preemption than that expressed by the Supreme Court in [*Dillingham*]" and noting that "nothing in ERISA attempts to preempt" all apprenticeship training programs). Indeed, as with state laws that undoubtedly will prevent ERISA-governed outfits from providing some forms of medical care, prepaid legal services and day-care services, state laws that prevent electrical contractors from providing some forms of apprenticeship training address matters that "are quite remote from the areas with which ERISA is expressly concerned." *Dillingham*, 519 U.S. at 330.

V.

For these reasons, we reverse.