*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

PEOPLE FIRST OF TENNESSEE, on behalf of all its members,

        *Intervenors-Appellees,*

PARENT-GUARDIAN ASSOCIATIONS OF ARLINGTON DEVELOPMENTAL CENTER,

        *Intervenor,*

    *v.*

STATE OF TENNESSEE; PHIL BREDESEN, in his official capacity as Governor of the State of Tennessee; VIRGINIA BETTS, in her official capacity as Commissioner of the Department of Mental Health and Developmental Disabilities; M.D. GOETZ, JR., in his official capacity as Commissioner of the Tennessee Department of Finance and Administration; NINA STAPLES, in her official capacity as Chief Officer of the Arlington Developmental Center,

        *Defendants-Appellants.*

No. 09-5474

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 92-02062—Bernice B. Donald, District Judge.

Argued: April 20, 2010

Decided and Filed: August 4, 2010

Before: BOGGS, SUHRHEINRICH, and ROGERS, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Michael W. Kirk, COOPER & KIRK, PLLC, Washington, D.C., for Appellants. Judith A. Gran, PUBLIC INTEREST LAW CENTER OF PHILADELPHIA, Philadelphia, Pennsylvania, Lisa J. Stark, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Michael W. Kirk, Charles J. Cooper, Derek L. Shaffer, Brian S. Koukoutchos, COOPER & KIRK, PLLC, Washington, D.C., Dianne S. Ducus, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants. Judith A. Gran, PUBLIC INTEREST LAW CENTER OF PHILADELPHIA, Philadelphia, Pennsylvania, Mark L. Gross, Sarah E. Harrington, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Earle J. Schwarz, LAW OFFICE, Memphis, Tennessee, for Appellees.

_____

**OPINION**

_____

SUHRHEINRICH, Circuit Judge.  The State of Tennessee ("State") appeals the district court's denial of its motion under Federal Rule of Civil Procedure Rule 60(b)(5). The sole issue on appeal is whether the district court abused its discretion when it refused to vacate all outstanding court orders and consent decrees granting injunctive relief ("injunctive relief").  This injunctive relief arises from the district court's original 1993 ruling that the State was violating the substantive due process rights of mentally retarded ("MR") residents at Arlington Development Center ("ADC"), a state-operated home for MR individuals.  The State argues that this injunctive relief, which has remained in place for over a decade, should be lifted because a significant change in law has occurred since the original judgment.  The United States Department of Justice Civil Rights Division ("United States") and People First of Tennessee ("People First"), a certified class of MR adults that benefits from the injunctive relief, oppose the State's request.  For the reasons set forth below, we **AFFIRM**.

### I. Background

The United States brought this suit against the State and some of its officials in January 1992, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997.  The complaint alleged, among other things, that the State failed to ensure that ADC

residents received adequate medical care, were free from neglect and abuse, and were not subject to undue bodily restraint. In support of its complaint, the United States argued that the State was violating the substantive due process rights of the MR residents at ADC, as established by the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307 (1982). In *Youngberg*, the mother of an involuntarily institutionalized MR man held at a state-run institution brought suit against the state on her son's behalf. *Id.* at 310. She contended that the state owed her son substantive due process rights under the Fourteenth Amendment because of his involuntary confinement. *Id.* The Court agreed and stated that when an individual is involuntarily institutionalized through state legal proceedings, he has a substantive due process right to adequate food, shelter, clothing, and medical care, as well as reasonable safety, freedom from unnecessary bodily restraint, and reasonable habilitation ("*Youngberg* rights"). *Id.* at 324. The United States argued that sufficient state action existed at ADC to trigger these *Youngberg* rights. The United States noted that the State ultimately decided to accept an MR individual into its care, ADC was a state-run facility, Tennessee law limited the circumstances under which a resident could be discharged from the facility, and the State controlled "virtually every aspect of the . . . lives" of ADC residents once admitted.

In March 1992, the State moved to dismiss the complaint. The State argued that the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), stood for the proposition that the State did not owe *Youngberg* rights to ADC residents. In *DeShaney*, the mother of a boy who was rendered profoundly retarded by his father's beatings brought suit on the boy's behalf against social workers and other local officials who knew that he was at risk of injury by his father but did nothing. *Id.* at 191. Even though the boy was not in state custody at the time of his abuse, he claimed that the government officials' failure to affirmatively act to protect him from his father deprived him of his Due Process Clause right to liberty. *Id.* The Court disagreed and held that *Youngberg* rights did not exist in this circumstance. *Id.* at 201. It reasoned:

> In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf–through incarceration, institutionalization, or other similar restraint of personal liberty–which is the deprivation of liberty triggering the protections of the

Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 200.  In reaching this conclusion, the Court limited its holding in *Youngberg* to "stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200.

The State argued that, in accordance with *DeShaney*, *Youngberg* did not apply because residents were not at ADC due to affirmative acts by the State.  It reasoned that, "with rare exception," parents or other legal representatives placed residents at ADC. Similarly, the State maintained that it did not engage in state action to involuntarily keep ADC residents at the facility because these same parents or other legal representatives could remove a resident at any time.

The district court denied the State's motion to dismiss in August 1992. *United States v. Tennessee*, 798 F. Supp. 483 (W.D. Tenn. 1992).  The district court discussed *Youngberg* and *DeShaney* in detail and determined that "under certain circumstances the state has a duty to provide services and care to institutionalized individuals[,]" such as when "a person is institutionalized–and wholly dependent on the State." *Id.* at 486.  Despite the fact that parents or other legal guardians voluntarily placed most ADC residents into the State's care, the court determined that the United States had alleged enough state action at ADC to implicate *Youngberg* rights. *Id.* at 487.  It noted that the State had accepted ADC residents into its care and thus accepted responsibility for their needs. *Id.*  The district court emphasized Tenn. Code Ann. § 33-5-103, which mandated that, once admitted to ADC, a resident was under the "exclusive care, custody and control of the commissioner and superintendent." *Id.*  The district court further noted Tenn. Code Ann. § 33-5-101(b), which suggested that the superintendent had discretion to deny a resident's discharge request. *Id.* at 487 n.8.  Lastly, the court underscored that state actors controlled every aspect of residents' daily life, including treatment, care, and movement in and out of ADC. *Id.* at 487.

In May 1993, Tennessee repealed Tenn. Code Ann. § 33-5-103 and amended its laws to make clear that the superintendent was required to discharge any individual within twelve hours upon request; however, a person lacking capacity still needed a parent or other legal

guardian to make this request. *See* Tenn. Code Ann. § 33-5-303. In July 1993, the State filed a second motion to dismiss based upon, among other things, these changes to Tennessee law. Nevertheless, after a four-week bench trial on the merits that began in August 1993, the district court issued an oral opinion in November 1993, held the State liable for violating ADC residents' *Youngberg* rights, and ordered the State, in cooperation with the United States, to submit a plan to remedy the constitutional violations at ADC. The court issued Supplemental Findings of Fact in February 1994, where it more specifically identified which conditions at ADC violated residents' *Youngberg* rights. These conditions included, *inter alia*, substandard training of staff, deficient supervision of residents who posed dangers to themselves and others, inadequate medical care and related health services, inadequate habilitation and psychological services, and improper feeding practices. The court found that these failures had led to thousands of injuries over the years.

In August 1994, the parties submitted a comprehensive stipulated remedial order to address the concerns raised in the district court's opinion. The remedial order included more than one hundred requirements that pertained to how the State would operate ADC in a constitutionally acceptable manner and a schedule for meeting these new requirements. The order included a plan to reduce the population of ADC by transitioning some current residents to arranged community living, an agreement to cease new admissions at ADC without court approval, a guarantee to provide some community-based services to former ADC residents, and new staffing and services requirements. The order also stated that a court-appointed monitor would oversee the State's compliance with the remedial plan. In September 1994, the district court approved the remedial order. The district court entered judgment in favor of the United States in August 1995. The State did not appeal this judgment.

During this time period, another case with similar allegations proceeded against the State. People First filed that suit in December 1991 and, in January 1993, the Parent Guardian Association of Arlington Development Center ("PGA") intervened. In September 1995, the district court extended its liability finding and remedial order in this case to that parallel case. The district court also permitted People First and PGA to intervene in this case. Furthermore, the district court approved a plaintiff class in this case defined as individuals who had resided, were residing, or were at risk of residing at ADC, and it

appointed People First as class representative. PGA appealed the district court's class certification decision, and the Sixth Circuit affirmed the creation of this plaintiff class and the district court's designation of People First as class representative. *People First of Tenn. v. Arlington Developmental Ctr.*, 145 F.3d 1332 (table), 1998 WL 246146, at *3 (6th Cir. 1998) (per curiam).

Also in 1995, the district court held the State in contempt for failure to comply with the remedial order. In the ensuing years, litigation between the parties has resulted in multiple findings of contempt, additional plans of corrections, settlement agreements, and consent orders. The injunctive relief has endured throughout this time. In its current form, the injunctive relief oversees benefits for a plaintiff class that encompasses approximately 1,200 individuals, most of which do not live at ADC. The injunctive relief guarantees class members comprehensive daily care in matters such as health, safety, and nutrition. It mandates funding for programs such as a state-provided healthcare program, a housing subsidy, a transportation subsidy, dental benefits, vision benefits, and advocacy services. A court-appointed monitor continues to oversee the injunctive relief. The State maintains that the injunctive relief causes it to spend around $30,000,000 a year more than it would if it treated the class members like other similarly situated MR persons in Tennessee.

In September 2008, the State filed this Rule 60(b)(5) motion and asked the district court to vacate the injunctive relief and dismiss the case. In support of its motion, the State argued that continuing the injunctive relief was inequitable because of changes in law that now made clear that the MR residents at ADC were not entitled to *Youngberg* rights because these residents resided voluntarily in the State's care. The State noted that, since 1993, Tennessee had amended its laws to guarantee discharge from a state-operated institution upon request. It further pointed to this court's unpublished decision in *Higgs v. Latham*, 946 F.2d 895 (table), 1991 WL 216464 (6th Cir. 1991) (per curiam), and decisions from our sister circuits that it argued supported its argument. The United States, People First, and PGA opposed this motion.[1]

---

[1] PGA did not file briefs in this appeal and is now called the West Tennessee Parent Guardian Association.

The district court held that the State had failed to establish the existence of a significant change in law and denied the motion. *United States v. Tennessee*, No. 92-2062, at 11 (W.D. Tenn. Feb. 18, 2009). The court acknowledged that, in some other circuits, the determination of whether an individual is entitled to *Youngberg* rights depends upon the method of the MR adult's confinement. *Id.* at *6-7. Nevertheless, it determined that ADC residents remained involuntarily committed because, although Tennessee had amended its laws to guarantee discharge at the request of a resident with capacity, the MR residents at ADC still depended upon the request of a parent or other legal representative to be discharged. *Id.* at *7-8. In support of this conclusion, the court cited *Doe v. Austin*, 848 F.2d 1386, 1392 (6th Cir. 1988), to hold that the law of this circuit remained that MR residents of state-run facilities are involuntarily committed into the state's care as a matter of law when another person instigated the commitment on behalf of the MR individual. *Id.* at *8. The court also rejected the State's contention that this court's unpublished decision in *Higgs*, which predated the original judgment in this case, could satisfy the requirement of showing a significant change in law simply because, according to the State, this circuit's rules regarding unpublished opinions had changed since the 1992 refusal to dismiss the complaint. *Id.* at *9-10. Lastly, the district court held that the injunctive relief should remain in force even if ADC residents voluntarily resided in state custody because they still retained certain substantive due process rights, such as freedom from undue restraint and physical abuse, that justified continuing the injunctive relief. *Id.* at *10. The State appeals.

## II.  Legal Standard

Federal Rule of Civil Procedure 60(b)(5) allows a court to grant relief from a final judgment when "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). We review a denial of a Rule 60(b)(5) motion for abuse of discretion. *Brown v. Tenn. Dep't of Fin. & Admin.*, 561 F.3d 542, 545 (6th Cir. 2009). "A court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 623 (6th Cir. 2008).

The Supreme Court has noted that "[i]t is true that the trial court has discretion, but the exercise of discretion cannot be permitted to stand if we find it rests upon a legal principle that can no longer be sustained." *Agostini v. Felton*, 521 U.S. 203, 238 (1997).

The Supreme Court recently addressed how courts should approach Rule 60(b)(5) motions in the context of institutional reform litigation in *Horne v. Flores*, 129 S. Ct. 2579 (2009).  The Court noted that federal encroachment upon states' rights is more likely to occur in institutional reform litigation and determined that "courts must take a 'flexible approach' to Rule 60(b)(5) motions addressing such decrees."  *Id.* at 2594 (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381 (1992)).  Specifically, the *Horne* Court directed courts not to focus on a party's failure to appeal when considering a motion under Rule 60(b)(5) in institutional reform litigation.  *Id.* at 2596.  Instead, courts must conduct

> the type of Rule 60(b)(5) inquiry prescribed in *Rufo.*  This inquiry makes no reference to the presence or absence of a timely appeal.  It takes the original judgment as a given and asks only whether "a significant change either in factual conditions or in law" renders continued enforcement of the judgment "detrimental to the public interest."

*Id.* at 2596-97 (quoting *Rufo*, 502 U.S. at 384); *see generally Sweeton v. Brown*, 27 F.3d 1162, 1166-67 (6th Cir. 1994) (en banc) ("Neither the doctrines of res judicata or waiver nor a proper respect for previously entered judgments requires that old injunctions remain in effect when the old law on which they were based has changed.").

Accordingly, despite the State's failure to appeal the original judgment entered by the district court, we now employ a *Rufo* analysis.  We take the original judgment as a given, and, because the State does not argue that a subsequent change in factual conditions has occurred, we determine whether a significant change in law has occurred since the original judgment.  The State bears the "initial burden" of showing a significant change in law because it is the "party seeking modification." *Rufo*, 502 U.S. at 384; *see also Brown*, 561 F.3d at 546 (noting some subsequent changes in decisional law and stating that "the remaining question is whether Tennessee has carried its burden of proof").  To meet this burden, the State must put forward "new court decisions or

statutes that make legal what once had been illegal." *Associated Builders & Contractors v. Mich. Dep't of Labor & Econ. Growth*, 543 F.3d 275, 278 (6th Cir. 2008).  Generally, for a new court decision to make legal what was once illegal, it must be a subsequent published decision of the Sixth Circuit or a decision from the United States Supreme Court.  *See, e.g., Doe v. Briley*, 562 F.3d 777, 784 (6th Cir. 2009) (affirming district court's order vacating injunctive relief where the constitutional claim upon which the initial decree was based was "utterly indistinguishable from the claim rejected [by the Supreme Court]" in an intervening case), *and Brown*, 561 F.3d at 548 (6th Cir. 2009) (applying *Rufo* and citing an intervening published Sixth Circuit decision to vacate the relevant part of a settlement).

The State employs several arguments in an attempt to convince this court that a significant change in law has occurred.  We consider each argument in turn.

### III.  Analysis

Many of the State's arguments focus on the Supreme Court's decision in *DeShaney* and its progeny—just as the State's arguments did in its March 1992 motion to dismiss.  We begin by noting that *DeShaney*, decided in 1989 and discussed and distinguished at length in the district court's August 1992 ruling on the motion to dismiss, is not a "new court decision[]." *Associated Builders*, 543 F.3d at 278.  As a result, *DeShaney* cannot satisfy the State's initial burden under *Rufo*.

For the same reason, our unpublished opinion in *Higgs* does not help the State. In *Higgs*, a mentally ill patient, admitted into a state-run mental hospital and subsequently sexually assaulted by another patient, unsuccessfully sued the state for violating her substantive due process rights.  *Higgs*, 1991 WL 216464, at *1.  Applying *DeShaney*, we held that the state did not owe the patient *Youngberg* rights because she voluntarily entered and resided in the state's care.  *Id.* at *3.  We reasoned that "there was no affirmative act by the hospital to deprive her of liberty, and therefore no triggering of the state's constitutional duty to protect those it renders helpless by confinement." *Id.* at *4 (internal quotation marks omitted).  As with *DeShaney*, we do not need to determine whether *Higgs* could be interpreted to support the State's

argument because it was decided in 1991, prior to the district court's oral ruling on liability in November 1993.

Moreover, *Higgs* is an unpublished opinion that does not bind this court in the way that a published opinion does. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 507 (6th Cir. 2007) (citing *United States v. Ennenga*, 263 F.3d 499, 504 (6th Cir. 2001)). And we are not convinced by the State's argument that *Higgs* can now be considered new law because, according to the State, unpublished decisions are more persuasive now than they were in August 1992 or November 1993. The fact that unpublished opinions may be cited, where before their citation was restricted, did not make them any more binding than they were before.

The amendments to Tennessee's laws subsequent to the August 1992 ruling on the motion to dismiss also cannot satisfy the State's initial burden. To meet its burden, the State must put forward "new . . . statutes." *Id.* Yet these amendments became law in May 1993, after the district court's August 1992 ruling but before the district court's November 1993 ruling on liability. The State even filed a second motion to dismiss in July 1993, prior to the court's November 1993 ruling, that focused in part on these changes in law.

Additionally, these changes to Tennessee's statutes did not "make legal what once had been illegal." *Id.* Section 33-5-303, the statute the state cites in favor of its argument, guarantees discharge upon request within twelve hours. But, a person who lacks capacity still must depend on a parent or other legal guardian to make this request. Accordingly, these changes are only relevant here if there has been a change in law regarding whether MR adults involuntarily reside in a state's care when they are incapable of competently choosing to stay or leave but have been voluntarily placed and kept in the state's care by a parent or other legal representative. However, this court's decision in *Austin* makes clear that the case law on this issue has not changed.

In *Austin*, the plaintiffs, a certified class of MR persons, sued the State of Kentucky to enjoin the commitment of MR persons to state-owned residential treatment centers without a hearing. *Austin*, 848 F.2d at 1388. Kentucky argued that the plaintiffs

lacked standing because their commitment into the facility was voluntary. *Id.* at 1391-92. Specifically, Kentucky had established a process where an MR adult could be admitted into state custody "voluntarily" if a parent or guardian initiated the commitment. *Id.* at 1392. This court rejected the notion that commitment could be considered voluntary in this circumstance: "By legislative fiat, the Commonwealth has deemed admissions initiated by a parent or guardian to be voluntary, with no regard for the actual wishes of the committed person." *Id.* This court continued:

> [T]he notion that the continuing confinement of the class members is voluntary notwithstanding the possible involuntariness of their initial confinement is, at best, an illusion. Indeed, the practice of relying upon some affirmative act on the part of profoundly and severely retarded persons to signal their will to escape confinement, coupled with the presence of a parent or guardian who may have played a pivotal role in institutionalizing the admittee in the first instance, creates a quite palpable danger that the adult child will be lost in the shuffle. We decline to adopt a measure of voluntariness for the commitment of adults that favors form over substance. Therefore, we agree with the district court that the commitment of mentally retarded adults by the Commonwealth upon application by a parent or guardian is to be considered involuntary.

*Id.* (internal quotation marks and citations omitted).

The thrust behind the district court's August 1992 ruling arguably was, consistent with *Austin*, that the State owed *Youngberg* rights to ADC residents because of the degree of State involvement in the daily life of its MR residents and these individuals' inability to manifest a desire to enter into or leave the State's care.[2] *See United States v. Tennessee*, 798 F. Supp. at 486-87. The fact that the modifications to the statutes after the 1992 motion to dismiss ruling did not compel the district court to modify its prior ruling further supports this conclusion. The changes to Tennessee's statutes did nothing to address these core concerns. As a result, these changes do not satisfy the State's initial burden, even if we ignore the fact that the changes preceded the imposition of the original judgment.

---

[2]The district court did not cite *Austin* in its August 1992 ruling, but the district court's reasoning in that ruling was nevertheless consistent with *Austin's* holding.

The State argues that the original judgment is no longer good law in the wake of *DeShaney* and its progeny, which the State maintains has been significantly clarified over time.  Specifically, the State maintains that a circuit split existed in the early 1990s regarding whether states owed *Youngberg* rights to residents that resided voluntarily in their care.  But, the State argues that these circuits have now reached a consensus that states do not owe *Youngberg* rights to MR residents who have been voluntarily placed into state care by a parent or other legal representative.  It further asserts that every published circuit court decision to consider this matter post-*DeShaney* has determined that involuntary confinement is required to implicate residents' *Youngberg* rights.  *See, e.g., Brooks v. Giuliani*, 84 F.3d 1454 (2d Cir. 1996) (applying *DeShaney* and holding that "the State Defendants had no duty under the Due Process Clause to provide professionally adequate care" because the plaintiffs, eighteen MR individuals, were voluntarily in the state's care.)

In making this claim, however, the State misconstrues the relevant question before this court.  Our *Rufo* analysis is limited to whether the State can meet its initial burden of pointing to "new court decisions or statutes that make legal what once had been illegal." *Associated Builders*, 543 F.3d at 278.  Although the parties dispute the holding and relevance of each of these cases, they all agree that these cases are not rulings of the Supreme Court or the Sixth Circuit.  In fact, a published decision of this circuit has recently stated that the Sixth Circuit has not weighed in on this purported circuit split: "At this time, we do not need to decide whether the State owes the same affirmative constitutional duties of care and protection to its voluntarily admitted residents as it owes to its involuntarily committed residents under *Youngberg*." *Lanman v. Hinson*, 529 F.3d 673, 681 n.1 (6th Cir. 2008).  Likewise, the Supreme Court has not squarely addressed this issue.  Therefore, although these cases from other circuits could potentially be persuasive if this case were before us in another context, they cannot, either individually or collectively, satisfy the State's initial burden.

We now turn to the State's contention that *Jackson v. Schultz*, 429 F.3d 586 (6th Cir. 2005), satisfies its initial burden.  This argument presents a closer question than the

ones already considered because *Jackson* is a published Sixth Circuit opinion that was issued several years after the district court's original judgment. Unfortunately for the State, however, *Jackson* did not "make legal what once had been illegal." *Associated Builders*, 543 F.3d at 278.

In *Jackson*, the mother of a deceased man alleged that government-employed EMTs had violated the decedent's substantive due process rights when they placed him into an ambulance and watched him die without providing medical care. *Jackson*, 429 F.3d at 588. Accepting the allegations in the complaint, the district court held that the EMTs had violated the "decedent's clearly established constitutional right to receive competent medical care while in custody." *Id.* This court disagreed:

> The district court improperly held that moving an unconscious patient into an ambulance is custody. This court's precedent has made clear that *DeShaney's* concept of custody does not extend this far. This court has never held that one merely placed in an ambulance is in custody. The proper custody inquiry is whether the EMTs engaged in a restraint of personal liberty similar to the restraints mentioned in *DeShaney*.... The restraints of personal liberty mentioned in *DeShaney* all require some state action that applies force (or the threat of force) and show of authority made with the intent of acquiring physical control.

*Id.* at 590 (internal citations and quotation marks omitted). The court continued:

> There is no allegation that the EMTs restrained or handcuffed the decedent. There is no allegation that the decedent was not free to leave the ambulance or be removed from the ambulance. Decedent's liberty was "constrained" by his incapacity, and his incapacity was in no way caused by the defendants.

*Id.* at 591. The court concluded that "no set of facts consistent with the allegations shows that the EMTs did anything to restrain the decedent's liberty. Thus, no set of facts consistent with the allegations supports a finding that the EMTs took decedent into custody." *Id.*

We begin our analysis of *Jackson* by acknowledging that there are some similarities that favor the State's argument. For example, the *Jackson* court emphasized that the defendants did not cause the deceased's incapacity, or his unconsciousness, and,

here, there are no allegations that the State caused the incapacity of the ADC residents, or their intellectual disabilities. Further, the man in *Jackson* was unconscious until his death, and, although he was free to leave whenever he chose, he could not choose to enter or leave the ambulance because of his incapacity. Similarly, although ADC residents are free to leave if they have capacity, most lack capacity and thus are reliant on another person to decide whether they will enter or leave the state's care.

However, there is a significant disparity in the amount of state control in each case. In *Jackson*, the man was "merely placed in an ambulance." *Id.* at 590. By contrast, ADC residents are subject to significant state involvement in almost every facet of their daily life—including their food, transportation, shelter, medical care, and protection—and they generally remain in the State's care for years. The comprehensive level of state involvement in this case renders *Jackson* inapplicable. Also, the *Jackson* court's use of *DeShaney* does not somehow incorporate *DeShaney* and its progeny—and specifically the cases from our sister circuits that the State claims satisfy its initial burden—into the binding case law of this circuit. Because *Jackson* is not a significant change in law under *Rufo*, *Jackson* cannot open the door for other cases to be considered, especially when we have already determined that these other cases are not significant changes in law.

The State's argument that this case, i.e., the Rule 60(b)(5) motion currently before the court, can qualify as the significant change in law under *Rufo* also fails. The only case law that the State provides to support this assertion is *Agostini*. In *Agostini*, the Supreme Court employed the *Rufo* standard in an Establishment Clause case and overturned an injunction that it had upheld ten years prior "in light of a bona fide, significant change in subsequent law." *Agostini*, 521 U.S. at 239. Contrary to the State's assertions otherwise, the Rule 60(b)(5) motion itself was not the significant change in law in *Agostini*. Instead, the Court noted that "more recent cases ha[d] undermined the assumptions upon which" the Court had relied when it first considered the case. *Id.* at 222. In fact, the majority in *Agostini* expressly rejected the argument now being made by the State. The Court made clear that "it was *Zobrest* [v. *Catalina*

*Foothills Sch. Dist.*, 509 U.S. 1, 7 (1993)]–and not this litigation–that created 'fresh law.'" *Id.* at 225. The State's interpretation of *Agostini* conflicts with the plain language of that opinion, and we decline to adopt it.

Lastly, *Horne* has not altered the standard for assessing Rule 60(b)(5) motions so that a subsequent change in fact or law is no longer needed in institutional reform litigation. The Court in *Horne* explicitly rejected this idea:

> This does not mean, as the dissent misleadingly suggests, that we are faulting the Court of Appeals for declining to decide whether the District Court's original order was correct in the first place. On the contrary . . . our criticism is that the Court of Appeals did not engage in the changed-circumstances inquiry prescribed by *Rufo*.

*Horne*, 129 S. Ct. at 2596 n.5 (internal citations omitted). Accordingly, we have properly limited our analysis to the traditional *Rufo* standard.

After considering each of the State's arguments, it is clear that the district court did not abuse its discretion when it dismissed the State's Rule 60(b)(5) motion. The State has not put forward a single case or statute that could qualify as the significant change in law required to satisfy its initial burden under *Rufo*. In light of this failure, the district court did not abuse its discretion when it refused to revisit the original judgment. Because our ruling on this issue is dispositive, we decline to address the district court's alternative conclusion that, even if residents are at ADC voluntarily, the injunctive relief should remain. Just like the district court, we also decline to address whether the State's motion was untimely because we do not need to resolve this issue to reach our holding.

### IV. Conclusion

For the foregoing reasons, we **AFFIRM**.