**UNITED STATES of America, Plaintiff,**

v.

**State of TENNESSEE, et al., Defendants.**

**People First of Tennessee, et al., Intervener.**

**No. 92–CV–2062–JPM–tmp.**

United States District Court, W.D. Tennessee, Western Division.

Sept. 4, 2012.

Amin Aminfar, Robert A. Koch, Shelley Ramell Jackson, Corey M. Sanders, Matthew Donnelly, Michelle Anne Jones, United States Department of Justice, R. Jonas Geissler, U.S. Department of Justice, Washington, DC, for Plaintiff.

Charles J. Cooper, Michael W. Kirk, Nicole J. Moss, David Lehn, Derek L. Shaffer, Jesse Panuccio, Cooper & Kirk PLLC, Washington, DC, Joe A. Dycus, U.S. Attorney's Office, Jonathan P. Lakey, Pietrangelo Cook, Memphis, TN, Dianne Stamey Dycus, Attorney General and Reporter, Martha A. Campbell, Tennessee Attorney General's Office, Nashville, TN, for Defendants.

Earle J. Schwarz, The Offices of Earle J. Schwarz, Kimbrough Brown Mullins, Mullins Gardner, PLC, Memphis, TN, Jack W. Derryberry, Jr., Ward Derryberry & Thompson, Marcella G. Derryberry, Law Offices of Marcella G. Derryberry Nashville, TN, Judith A. Gran, Reisman Carolla Gran, LLP, Haddonfield, NJ, William F. Sherman, Law Offices of William F. Sherman, Little Rock, AR, for Intervener.

## ORDER DENYING DEFENDANTS' AMENDED MOTION TO VACATE AND DISMISS

JON P. McCALLA, Chief Judge.

Before the Court is Defendant State of Tennessee's ("the State") Amended Motion

to Vacate All Outstanding Orders and Dismiss the Case (Docket Entry ("D.E.") 2737), filed on August 11, 2011. The United States and People First of Tennessee both filed responses in opposition on August 31, 2011. (D.E. 2741; D.E. 2742.) The State filed a reply on September 12, 2011. (D.E. 2764.) On September 27, 2011, the case was transferred to this Court. (D.E. 2752.) The Court held an evidentiary hearing on the State's Motion on January 3rd and 4th, 2012. (D.E. 2799; D.E. 2801.) Following the hearing, the Court allowed the parties to submit closing briefs, which the parties did on April 30, 2012. (D.E. 2867; D.E. 2868; D.E. 2870.) The Court heard closing arguments on the Motion on June 18, 2012. (D.E. 2890.) For the reasons that follow, the Court DENIES the State's Motion.

## I. BACKGROUND

### a. Case History

This case arises from the unconstitutional conditions that existed at the Arlington Developmental Center ("Arlington") in Arlington, Tennessee. In 1992, the United States brought suit against the State pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, alleging that the care and conditions at Arlington violated the substantive due process rights of the center's residents. At the same time, People First, an advocacy organization for persons with disabilities, and individual residents of Arlington brought a class action suit against the State on behalf of all the residents of Arlington and all those "at risk" of institutionalization at Arlington. The Court held a trial in *United States v. Tennessee* in 1993. At trial the Court found that the conditions at Arlington did not comply with the substantive due process requirements of the Fourteenth Amendment as articulated by the Supreme Court in

*Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). (*See* Supplemental Findings of Fact (D.E. 251) 4.) Following the trial and the parties' negotiations, the Court entered the Remedial Order (D.E. 338) requiring the State to take certain actions to guarantee the *Youngberg* rights of Arlington's residents.

In September 1995, the Court certified the class in the People First action, defining the class as including individuals who had resided, were residing, or were at risk of residing at Arlington. The Sixth Circuit affirmed the certification of this class. *People First of Tenn. v. Arlington Developmental Ctr.*, 145 F.3d 1332 (table), 1998 WL 246146, at *3 (6th Cir. May 7, 1998) (per curiam). The Court allowed People First to intervene in *United States v. Tennessee* and extended its liability finding and the Remedial Order in *United States v. Tennessee* to the People First class. As a result of these consolidated cases, the Court has for nearly two decades provided judicial supervision over the conditions at Arlington and the State's services for class members.

The Sixth Circuit has noted, "litigation between the parties has resulted in multiple findings of contempt, additional plans of corrections, settlement agreements, and consent orders." *United States v. Tennessee*, 615 F.3d 646, 651 (6th Cir.2010). The Remedial Order, the Court's first remedy, contained more than 150 requirements and 103 deadlines. The Remedial Order enjoined the State from admitting any additional residents to Arlington except for emergency, short-term, and court-ordered admissions. The Remedial Order also called for the appointment of a Court Monitor to oversee the State's implementation of the Court's mandates. Nancy K. Ray, Ed.D., has served as the Court Monitor since 2000, with the assistance of her staff

at NKR & Associates, Inc., located in Delmar, New York.

In 1997, the Court entered the Community Plan (D.E. 753). The Community Plan was the result of a settlement between the parties after the United States filed a fourth motion for contempt regarding the conditions at Arlington. Like the Remedial Order, the Community Plan was a detailed document that set forth hundreds of specific provisions to improve the quality of care at Arlington. The Court noted in its Order that the Community Plan "represents a paradigm shift by the State of Tennessee in the provision of services to the developmentally disabled." (Order on Community Plan of W. Tenn. (D.E. 753) 3.) Relevant to the present status of this litigation is a provision from the Community Plan prohibiting the placement of class members in non-community homes. This provision applies to all members of the class, both members who were residents of Arlington and those at risk of placement at Arlington. The United States and People First argue that the State is currently violating this provision by placing class members in non-community homes. (See United States' Mem. of Law in Opp'n to State's Updated and Am. Mot. to Vacate and Dismiss (D.E. 2741) 15.)

In 1999, the Court formed the Community Services Network of West Tennessee, a non-profit corporation dedicated to directing health-related services provided with state funds to Arlington class members. (See D.E. 1248.) In creating the Community Services Network, the Court interpreted the definition of "at risk" class members to include all individuals in the geographic area served by Arlington who demonstrate medical needs sufficient to require institutional care. (Order Regarding Scope of "At–Risk" Population (D.E. 1302).) At the time, this class definition was estimated to include 800 to 1200 individuals in West Tennessee.

In 2006, the parties reached another settlement agreement (2006 Settlement Agreement (D.E. 2085–1)), which the Court approved (see All–Party Consent Order Approving 2006 Settlement (D.E. 2174)). The agreement was intended "to resolve and fully settle all claims arising between [the parties] in connection with the appeal pending [before the Sixth Circuit] ..., regarding the proper interpretation of the 'at-risk' portion of the class definition." (2006 Settlement Agreement 1.) The agreement called for the closure of Arlington and modified the definition of "at-risk" for the purposes of class membership. The "at-risk" portion of class members was defined as persons who reside in the region served by Arlington (i.e., West Tennessee), who meet Medicaid eligibility criteria for an Intermediate Care Facility for the Developmentally Disabled ("ICF/DD") and demonstrate a need or desire for institutional placement by: (i) residing in a nursing home or mental health facility, (ii) residing in a private ICF/DD, (iii) having been placed in a public ICF/DD in middle or eastern Tennessee, or (iv) having been hospitalized or placed in respite care and not being able to return to pre-hospitalization placement due to a need for more intensive services. (2006 Settlement Agreement 12.)

Pursuant to the 2006 Settlement Agreement, the parties developed a plan to transition from the Community Services Network to a Medicaid-funded integrated health services delivery model that would be part of a new statewide service program for persons with intellectual disabilities. (See Mem. Op. (D.E. 2517).) The plan also required all Arlington residents to be transitioned to other facilities and settings. The transition plans for individual residents were subject to the approval

of the Court Monitor. On October 27, 2010, the last residents of Arlington transitioned to new facilities, and the State closed Arlington.

### b. Recent Procedural History

Even before the closure of Arlington, the State moved to vacate the Court's injunctive relief and dismiss the case. In September 2008, the State filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 60(b)(5), arguing that changes in law indicated that residents of Arlington were no longer entitled to *Youngberg* Rights, and, therefore, continuing the injunctive relief was inequitable. The Court disagreed and denied the State's motion. The Sixth Circuit affirmed the Court's decision. *United States v. Tennessee*, 615 F.3d 646, 657 (2010).

The closure of Arlington in October 2010 again prompted a dispute over the future of this litigation. The State maintains that the closure of Arlington should lead to the termination of the litigation and the vacating of all outstanding orders. The United States and People First argue that despite the closure of Arlington, the State continues to provide inadequate and segregated services in violation of the substantive due process rights of class members and the Court's remedial orders, and thus the Court's supervision remains necessary.

On October 22, 2010, People First filed a Motion for an Order to the State to Proceed with Enrollment of At Risk Class Members (D.E. 2604), alleging that the State has failed to enroll hundreds of individuals who qualify as at-risk class members under the terms of the 2006 Settlement Agreement. On November 3, 2010, the State filed a Motion to Vacate All Outstanding Injunctive Relief and Dismiss the Case (D.E. 2605). On November 5, 2010, the United States filed a Motion to Enforce Judgment of the 2006 Settlement Agreement (D.E. 2608), seeking essentially the same relief as People First's Motion for an Order to the State to Proceed with Enrollment of At Risk Class Members. The Court issued an Order Setting a Schedule for Disposition of Pending Motions (D.E. 2676) on April 4, 2011, after considering a Report and Recommendation from the Magistrate Judge. The Court determined that the State's Motion to Vacate should be decided before considering the motions of the United States and People First to enroll new class members. (*See id.* at 2–3.) On June 30, 2011, the Court, with the consent of the parties, entered an Agreed Order Vacating in part Orders Relating to Conditions at Arlington Residential Units (D.E. 2724), vacating the Court's orders that dealt specifically with conditions at Arlington. Left outstanding by the Agreed Order was whether the litigation would continue. On August 11, 2011, the State filed an Amended Motion to Vacate All Outstanding Orders and to Dismiss the Case (D.E. 2737). After the Amended Motion was briefed by the parties, the Court conducted an evidentiary hearing on January 3rd and 4th, 2012.

### c. The January 2012 Hearing

The Court held an evidentiary hearing[1] to afford the State an opportunity to demonstrate that vacating the Court's orders and dismissing the case is warranted. The State declined to call any witnesses at the hearing, relying instead on the declarations and depositions it filed as exhibits to its Motion. From the State's perspective, the issue before the Court "is almost entirely legal." (Jan. 3, 2012 Tr. (D.E. 2810) 14.) As the State argued at the hearing,

---

1. The hearing was video recorded as part of the Judicial Conference's Cameras Pilot Project, and is available for viewing at http://www.uscourts.gov/multimedia/Cameras.aspx.

"the sole violation of federal law that the Court has found in this case arises from the conditions at the Arlington Developmental Center, and with the closure of [Arlington] and the transition of all the residents at [Arlington] to community placements that were approved by the Court Monitor, that violation has been fully and completely remedied." (*Id.* at 15.) The State submitted that Arlington's closure and the transition of its residents to approved placements is determinative of the issue.

The United States and People First maintain that the Court should deny the State's Motion because (1) there are ongoing constitution violations, (2) the closure of Arlington is not a significant change in fact that renders the Court's remedial orders inequitable or unworkable, and (3) there is no durable remedy in place. (*See id.* at 38–39.) In support of their position, the United States and People First called three witnesses at the hearing: Dr. Ray, the Court Monitor; Fred Hix, Assistant Commissioner of the Tennessee Department of Intellectual and Developmental Disabilities; and James W. Conroy, Ph.D. The testimony is summarized as follows.

### 1. Dr. Ray

Dr. Ray testified that she has been the Court Monitor in this case since 2000. (Jan. 3, 2012 Tr. 59.) Dr. Ray has a doctorate in education from the State University of New York at Albany and has worked in the special education field and with people with developmental disabilities for decades. (*Id.* at 188–89.) As the State noted on cross-examination, Dr. Ray is not a psychiatrist, behavioral analyst, clinical therapist, or lawyer. (*Id.*) In accordance with her role as the Court Monitor in this action, Dr. Ray provided testimony regarding the services the State provides class members pursuant to the Court's remedial orders and her opinion regarding whether the State's actions are in compliance with the Court's orders.

### A. Overview of the Class

Dr. Ray stated that there are approximately 1030 class members currently enrolled in this action. (*Id.* at 200.) Approximately 540 of these class members reside in community homes operated by private providers and funded through Medicaid. (*Id.* at 200–01.) Dr. Ray testified that based on her assessments these community service networks are performing well. (*Id.* at 211–12.) Approximately 240 class members reside in Independent Care Facilities for people with developmental disabilities, referred to as ICF/DD facilities. (*Id.* at 212.) There are five major ICF/DD providers serving class members. Three of these five providers meet Dr. Ray's criteria for a "quality" provider, but the two ICF/DD providers serving the majority of class members do not meet Dr. Ray's "quality tier" standards. (*Id.* at 213.) Approximately 125 class members reside in nursing homes (*id.* at 206), and Dr. Ray identified serious issues with the care class members receive in nursing home settings (*see id.* at 62). The approximately 100 remaining class members live with their families or reside in other settings, such as mental health facilities or prisons. (*Id.* at 207.)

### B. Class Members in Nursing Homes

The Court admitted as Exhibit 1 a report prepared by Dr. Ray entitled Arlington Class Members in Nursing Facilities, An Updated Assessment. (*Id.* at 61.) Dr. Ray summarized her findings from the report, stating that "[t]he most common issue was that class members in nursing homes were often not receiving specialty medical consultations for diagnoses that if they had been in a community placement, they would have." (*Id.* at 62.) Dr. Ray identified several other problems regard-

ing the services class members receive in nursing homes, including: the monitoring of class members' health statuses; the implementation of physicians' orders, including administering the correct psychotropic medications to class members; and providing adequate dental care. (*Id.* at 62–63.)

Dr. Ray testified that her report was the fourth in a series of reports she provided the State regarding the care and services class members receive in nursing homes. (*Id.* at 63.) Dr. Ray stated that the State has not addressed the issues she raised in her reports. (*Id.*) According to Dr. Ray, the State could have made efforts to remedy the deficiencies in nursing home services by asking the State health department, which has regulatory oversight of the nursing homes, to investigate the issues raised in her reports. (*Id.* at 63–64.) The State, however, has not done so. (*Id.* at 64.) Dr. Ray found the care deficient in the majority of nursing homes that she reviewed. (*Id.* at 68.)

Dr. Ray testified it is her understanding that federal Medicaid regulations preclude people with intellectual disabilities from being admitted for long-term care in nursing homes. (*Id.* at 65.) In Tennessee, the Department of Intellectual and Developmental Disabilities is responsible for reviewing nursing home admissions to ensure individuals with developmental disabilities reside in appropriate settings. (*Id.*) Dr. Ray stated that despite the State's review process, she has identified individuals who are not residing in appropriate settings. (*Id.* at 66.) Dr. Ray found in her report that sixty-two percent of the individuals in nursing homes were recommended for alternative community placement. (*Id.* at 67.) Since 2008, however, only twenty-five class members have transitioned from nursing homes to community placements. (*Id.* at 68.)

In many cases, the class members in nursing homes do not have legally appointed guardians to choose their placement. (*Id.* at 69.) Dr. Ray stated, "when the individuals in nursing homes were enrolled in the at-risk class, almost none of them had legally appointed conservators, almost all of them had compromised decision-making ability." (*Id.*) Dr. Ray explained that once an individual is enrolled as a class member, the State begins the process of ensuring a legal guardian is appointed. Dr. Ray found, however, that from a sample of thirty-seven class members, seventy-six percent were still awaiting the appointment of a legal conservator. (*Id.*) Under the Court's Community Plan, all class members who are in need of a conservator are required to have one appointed. (*Id.*) The Court's orders also require class members to be assigned an independent support coordinator to facilitate the transitioning of individuals from institutional placements into community placements. (*Id.* at 112.) Dr. Ray testified that the State has not complied with this requirement. (*Id.*)

Dr. Ray stated that there are not sufficient community-based residential waiver providers to accommodate all the class members who currently reside in nursing homes. (*Id.* at 70.) Accordingly to Dr. Ray, "[s]omething different would have to happen to make the community service system available to individuals who are class members in nursing homes," given the limited number of placements in these facilities currently available. (*Id.* at 71.) The lack of opportunities for placement in community settings leaves many class members without meaningful choices for their care. (*Id.* at 72.) Because class members lack legal conservators and do not have the option of transitioning to community placements, Dr. Ray asserted that these class members cannot be

deemed to reside in nursing homes "voluntarily." (*Id.*)

The Court received, as Exhibit 2, a second report prepared by Dr. Ray assessing the care received by Arlington class members who reside in nursing facilities. Dr. Ray read the summary of her report:

> Gaps in provisions of recommended medical and nursing services were identified for 47 of the 71 individuals, or 66 percent. Gaps most often noted with regard to individuals not receiving specialty medical assessments recommended by their primary care physicians are apparently needed due to the class members' unstable health care status. Other common gaps were associated with poor health status tracking or response to health status tracking data by nursing personnel. The most frequent issues were noted in tracking and responding to unusual patterns in class members' weights, bowel movements, sleep and intake, food intake. Many class members were also not regularly being seen by a podiatrist in accordance with physicians' orders.

(*Id.* at 76.) In addition, Dr. Ray explained that medical treatment for class members is sometimes delayed or compromised because the class members lack legal conservators. (*See id.* at 162.)

In follow-ups assessments, Dr. Ray found that the problems she identified in her report were not addressed. (*Id.* at 76–77.) Dr. Ray testified that her reports and the reports prepared by the State's Department of Intellectual and Developmental Disabilities were not being shared with the State's Health Department, which oversees nursing home facilities. (*Id.* at 78.) Dr. Ray stated that, in addition, the State does not have a tracking system to insure compliance with the Court's orders for class members in nursing homes. (*Id.* at 79.)

Dr. Ray testified, based on her assessments and reports on the care received by class members in nursing homes, that in her opinion the State has not complied with the Court's Remedial Order, Community Plan, and 2006 Settlement Agreement. (*Id.* at 83.) Moreover, Dr. Ray stated that the State has not made a good faith effort to comply with the Court's remedial orders. (*Id.*)

### C. Class Members in ICF/DD Facilities

Dr. Ray testified regarding the quality of care and services class members receive in ICF/DD facilities. The Court admitted, as Exhibit 10, Dr. Ray's 2011 annual review of the ICF/DD providers. (*Id.* at 115.) Dr. Ray stated that the two programs serving the largest number of class members, Open Arms Corporation and RHA West Tennessee, do not met her quality standards. (*Id.* at 116.) As Dr. Ray explained, the Court's orders require the State to ensure these programs meet standards of care that are assessed by the Court Monitor's assessment tool. (*Id.* at 214.) Dr. Ray stated that the State uses its own quality assurance monitoring tool, but she feels the scores based on the State's assessments are "inflated." (*Id.* at 114.) In Dr. Ray's opinion, "the government's role in effectively encouraging these ICF/DD programs to assure quality services and support, however, remains ineffective." (*Id.* at 220.)

For Open Arms and RHA West Tennessee programs, Dr. Ray found serious problems with staff competence, medication administration, medical services, therapy services and individual record keeping. One area of particular concern was the reliance of RHA West Tennessee on the Winfrey Center to provide day services. (*Id.* at 117.) Dr. Ray testified that the program has not been able to adequately

supervise individuals at the day center, protect them from harm, or provide active treatment in accordance with federal and state ICF/DD requirements. (*Id.*) Dr. Ray has found high levels of abuse and neglect in the RHA West Tennessee program. (*Id.* at 118.) On cross-examination, Dr. Ray noted that there has been limited improvement over the last few years in the services provided by Open Arms and RHA West Tennessee. (*Id.* at 218.)

### D. Violence in Community Homes

Dr. Ray testified that another area of concern is the incidents of violence that occur at community homes, both community-based residential homes and ICF/DD homes. Dr. Ray described the findings of her report, A Review of Selected Class Members Frequently Involved in Violent and Dangerous Incidents, admitted as Exhibit 3. The report is one of a series Dr. Ray has provided to the State and the Court detailing incidents of violence involving class members residing in community placements. Dr. Ray compiled the data in her reports from two of the State's Department of Intellectual and Developmental Disabilities data systems. (*Id.* at 304.) Dr. Ray testified that the State does not maintain a fully electronic reporting system that allows providers to electronically submit incident reports, causing delays in data collection and reporting. (*Id.* at 322.)

Dr. Ray explained that she found a variety of violent incidents occurring at community homes, including physical assaults, verbal assaults, threats of violence, property destruction, and self harm. (*Id.* at 84–85.) Dr. Ray testified that she has made recommendations to the State to implement various approaches to reduce the number of occurrences of violent incidents in community homes. (*Id.* at 85.) Dr. Ray has recommended improving support and training for community home staff,

paying more attention to the self-determination rights of class members, and studying different behavior support models. (*Id.* at 85–87.) The State has only responded to one of the Court Monitor's reports concerning these violent and dangerous incidents and has not responded to any of her recommendations. (*Id.* at 87–88.) Dr. Ray stated that, in her opinion, the State's failure to establish a comprehensive plan to mitigate the violence occurring in community homes violates professional standards of care. (*Id.* at 92–93.)

### E. New Class Member Enrollment

The United States questioned Dr. Ray regarding the State's enrollment of new class members following the 2006 Settlement Agreement. As discussed above, the State was required by the 2006 Settlement Agreement to enroll new class members who met the "at-risk" definition agreed to in the settlement. For enrollment in the class, the State required an individual to undergo a preadmission enrollment evaluation ("PAE"), a requirement of the Medicaid eligibility criteria for placement in an intermediate care facility. Dr. Ray testified that the PAE is in place as "a payment tool" and that the evaluation must be completed in order to bill for services. (*Id.* at 97.) The State insisted that a PAE be completed before an individual was enrolled as a class member. (*Id.* at 98.) A state agency, TennCare, is responsible for administering the PAE. (*Id.*) Dr. Ray testified that there were significant delays—in some cases more than a year—in the enrollment of class members as individuals waited to receive a PAE. (*Id.*)

Many individuals did not complete their PAEs prior to the closure of Arlington, and, consequently, the State refused to enroll these individuals as class members. (*Id.* at 98–99.) Dr. Ray testified that of the 170 individuals denied admission into the class due to the closure of Arlington,

123 had previously been referred for a PAE after a favorable eligibility review by the Joint State and Court Monitor's Committee: twenty-six of these individuals were referred for a PAE in 2010; sixty were referred for a PAE in 2009; sixteen were referred for a PAE in 2008; and for thirty-seven individuals, no specific referral date was available, but the referral occurred in either 2008 or 2009. (*Id.* at 100.) Dr. Ray also testified that many of the individuals denied class membership because of the delays in PAE processing reside in mental health facilities operated by the State. (*Id.* at 101.) Dr. Ray stated that, in her opinion, the delays in PAE processing for individuals approved for class members was evidence of bad faith on the part of the State in complying with the 2006 Settlement Agreement. (*Id.* at 100.)

### F. Arlington Woods Homes

As part of the 2006 Settlement Agreement, the State agreed to open new ICF/DD community homes interspersed in residential neighborhoods. (*Id.* at 105.) The Court admitted, as Exhibit 9, an aerial photograph of Arlington and the Arlington Woods Homes, an ICF/DD facility opened by the State following the 2006 Settlement Agreement. Dr. Ray testified that the Arlington Woods Homes are not interspersed in a residential neighborhood and the homes are not integrated into the surrounding community. (*Id.* at 106–07.) Dr. Ray approved the placement of the Arlington Woods Homes, but testified that she was not given the opportunity to approve the placement before construction of the homes began. (*Id.* at 230.) Dr. Ray stated that she "felt snookered by the State ... in terms of the location of the homes and that they hadn't been forthcoming in telling me about that until the homes were already underway." (*Id.* at 230–31.) Dr. Ray ultimately approved the location of the homes, but did not feel "the State made a good faith effort in disclosing where these homes were going to be." (*Id.* at 231.) Based on the location of the Arlington Woods Homes, Dr. Ray stated that she did not believe the State made a reasonable effort to comply with the 2006 Settlement Agreement's requirement that ICF/DD homes be interspersed in residential neighborhoods. (*Id.* at 107.)

### G. Ending the Court's Supervision

Dr. Ray testified that there are priorities she could identify to help bring this case to a completion. (*Id.* at 143.) Dr. Ray stated that she believes "the parties would need to make some compromises in terms of identifying a relatively small set of exit criteria that need to be achieved" so that the Court's supervision could end. (*Id.*) Dr. Ray stated that she was willing to participate in a mediation with the parties to establish an appropriate "exit criteria." (*Id.* at 144.) Dr. Ray testified that she believes that "assuming good faith efforts," the State could resolve the outstanding issues regarding compliance "within a year or two." (*Id.* at 150.)

### 2. Fred Hix

The United States called Fred Hix as its second witness. (Jan. 4, 2012 Tr. (D.E. 2811) 379.) Mr. Hix explained that he is the "business manager for the Department of Intellectual and Developmental Disabilities holding the working title of Assistant Commissioner for Administration." (*Id.*) Mr. Hix testified as to the financial costs of implementing the governing orders in this case. The State's position is that the orders in this case require the State to spend substantially more money providing services to Arlington class members than for identically situated non-class members with intellectual disabilities in the statewide waivers. (*See* Decl. of James M. Henry (D.E. 2737–2) 4.) Mr. Hix admitted,

however, that his analysis of the costs associated with class members versus non-class members did not compare individuals with similar disabilities. (*See* Jan. 4, 2012 Tr. 383–84.) For instance, while sixty-five percent of individuals in the state-wide waiver program are entitled to receive residential services based on their disabilities, one hundred percent of Arlington class members are entitled to residential services. (*Id.*) Mr. Hix's study comparing the cost of waivers for Arlington class members with the cost of the state-wide waivers did not account for these differences in need levels that exist between the two groups. (*See id.* at 389–90, 395.)

### 3. James W. Conroy

People First called James W. Conroy, Ph.D., as its witness. Dr. Conroy stated that he has a doctorate in medical sociology with a specialization in health economics from Temple University. (*Id.* at 410.) Dr. Conroy stated that he has testified as an expert on behalf of states seeking to end the supervision of federal district courts in litigations regarding state services for individuals with disabilities. (*Id.*) In those cases, Dr. Conroy collected data and prepared reports concerning improvements to the class members' quality of life. (*See id.* at 419–21.) The Court received Dr. Conroy as an expert witness in the field of medical sociology, specifically in the field of intellectual and developmental disabilities and cost outcome evaluation. (*Id.* at 422–23.)

Dr. Conroy disagreed with the State's analysis that it spends more on Arlington class members than on similarly situated non-class members. (*Id.* at 425.) Dr. Conroy stated that the Arlington class members do not have similar characteristics as the average waiver recipient. (*Id.*) According to Dr. Conroy, "what we have here is pure apples and oranges, that the

folks coming out of Arlington do cost more, and I think they should cost more, and what's dictated, what's prescribed in their ISPs is the ultimate determinative cost." (*Id.* at 441.) To do a valid comparison, Dr. Conroy stated the State would need to conduct a "twin study" comparing Arlington class members and non-class members with similar levels of need based on similar disabilities. (*Id.* at 441–42.)

Dr. Conroy noted the improvements the State has made in providing services for persons with disabilities. Dr. Conroy stated, "Tennessee has come so far in 30 years, so far forward in supporting people with intellectual and developmental disabilities, it's most commendable and exciting really." (*Id.* at 445.) Dr. Conroy stated that in his experience, courts have played a significant role in ensuring adequate services for people with disabilities. (*Id.* at 458.) Dr. Conroy acknowledged, "there comes a day when the human service system can't be run by courts," however, "in order to be sure about the folks we have worked so hard for two decades to get a better life for, we want to make sure there are some guaranties [sic] and protections." (*Id.* at 458–59.)

### d. Post Hearing Activity

At the January hearing, the Court granted the State leave to submit evidence in support of its Motion. (*See* Jan 4, 2012 Tr. 396.) The Court also indicated it was willing to reconvene to allow the State to present fact witnesses or expert testimony. (*Id.* at 397.) The State submitted three affidavits: (1) a declaration of Fred Hix concerning whether the State has ever employed Dr. Ray on matters besides the Arlington case; (2) a declaration of C.J. McMorran, the West Tennessee Regional Director for the Department of Intellectual and Developmental Disabilities, rebutting several contentions made by Dr. Ray dur-

ing her testimony; and (3) a declaration of Scott J. Modell, Deputy Commissioner of the Department of Intellectual and Developmental Disabilities, regarding the State's effort to create an electronic incident report system. (D.E. 2819.) The United States filed a Motion to Strike these affidavits (D.E. 2861), but the Court denied the motion. The State declined the Court's invitation to present any witnesses or expert testimony.

The State filed a Motion to Strike Court Monitor's Testimony and Reports (D.E. 2817.), which the Court denied. West Parent Guardian Association file a motion for leave to file documents (D.E. 2862), and the Court denied this motion as well. The Court permitted the parties to submit closing briefs on the State's Motion, and on June 18, 2012, the Court heard the parties' final arguments.[2] (D.E. 2890.)

## II. STANDARD OF REVIEW

The parties disagree as to the proper standard the Court should apply in evaluating the State's Motion to Vacate and Dismiss. The State asserts that "the question before the Court is governed by first principles that the Supreme Court has announced" in *Frew v. Hawkins*, 540 U.S. 431, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004), and *Horne v. Flores*, 557 U.S. 433, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009). (June 18, 2012 Tr. (D.E. 2895) 8.) *Frew* and *Horne* caution that in institutional reform litigation, such as the case at bar, "courts [should] ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Horne*, 129 S.Ct. at 2595 (quoting *Frew*, 540 U.S. at 442, 124 S.Ct. 899). The United States and People First, while acknowl-

edging the applicability of *Frew* and *Horne* to the Court's analysis, maintain that Federal Rule of Civil Procedure 60(b) governs the State's motion. The United States and People First point out that the State seeks relief from the Court's remedial orders and a Rule 60 motion is the proper vehicle under the Federal Rules to seek such relief.

The Court agrees with the United States and People First that the State's Motion should be evaluated under Rule 60(b). Indeed, the Supreme Court's analysis in *Frew* and *Horne* proceeded under Rule 60(b). *See Frew*, 540 U.S. at 441, 124 S.Ct. 899; *Horne*, 129 S.Ct. at 2593. While the Supreme Court's directives in *Frew* and *Horne* are certainly relevant in the Court's consideration of the State's Motion, those directives must be viewed in the Rule 60(b) context. Accordingly, because the State's Motion seeks relief from the Court's remedial orders, the Court will evaluate the Motion pursuant to Rule 60(b).

▆ Rule 60(b) states that the court may relieve a party from a final judgment, order, or proceeding when "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed.R.Civ.P. 60(b)(5). The Supreme Court has explained that the rule "provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne*, 129 S.Ct. at 2593 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)). "The party seeking relief

---

2. The parties final arguments were recorded as part of the Judicial Conference's Cameras Pilot Project, and is available for viewing at http://www.uscourts.gov/multimedia/Cameras.aspx.

bears the burden of establishing that changed circumstances warrant relief." *Id.* This burden is heightened when the change in conditions was anticipated by the party challenging the decree:

> If it is clear that a party anticipated changing conditions ... but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).

*Rufo,* 502 U.S. at 385, 112 S.Ct. 748. "[O]nce a party carries this burden," however, "a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne,* 129 S.Ct. at 2593 (quoting *Agostini v. Felton,* 521 U.S. 203, 215, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)).

The Supreme Court set forth further guidance in *Horne* for courts to follow in applying Rule 60(b)(5) to "institutional reform litigation." The Court noted, "injunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem ...—that warrant reexamination of the original judgment." *Id.* In addition, "institutional reform injunctions often raise sensitive federalism concerns," and these concerns "are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities." *Id.* at 2593–94. In sum, the Court instructed:

> It goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief. But in recognition of the features of institutional reform decrees, we have held that courts must take a "flexible approach" to Rule

60(b)(5) motions addressing such decrees. *Rufo,* 502 U.S. at 381, 112 S.Ct. 748. A flexible approach allows courts to ensure that "responsibility for discharging the State's obligations is returned promptly to the State and its officials" when the circumstances warrant. *Frew,* [540 U.S.] at 442, 124 S.Ct. 899. In applying this flexible approach, courts must remain attentive to the fact that "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation." *Milliken v. Bradley,* 433 U.S. 267, 282, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). "If [a federal consent decree is] not limited to reasonable and necessary implementations of federal law," it may "improperly deprive future officials of their designated legislative and executive powers." *Frew,* [540 U.S.] at 441, 124 S.Ct. 899.

*Id.* at 2594–95.

For the reasons noted above, the Court in *Horne* concluded, "a critical question in this Rule 60(b)(5) inquiry is whether the objective of the District Court's ... order ... has been achieved. If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id.* at 2595.

### III. ANALYSIS

■ The Court finds that the State has not met its burden in showing that relief from the Court's remedial orders and dismissal of the case is warranted under Rule 60(b). The State has not demonstrated that the Court's judgment and orders have "been satisfied ... or that applying [them] prospectively is no longer equitable." Fed.R.Civ.P. 60(b)(5). The Court is not persuaded that the objective of the Court's remedial orders has been achieved and a durable remedy is in place. *See Horne,*

129 S.Ct. at 2595. Moreover, because the closure of Arlington was anticipated by the parties when executing the 2006 Settlement Agreement, the State has a "heavy burden" to demonstrate it agreed to the settlement in good faith, made a reasonable effort to comply with the terms of the settlement, and should be relieved of the undertaking under Rule 60(b). *See Rufo*, 502 U.S. at 385, 112 S.Ct. 748. The State has not satisfied this burden.

The State's submission rests almost entirely on the fact that Arlington has closed and its residents have transferred to placements approved by the Court Monitor pursuant to the 2006 Settlement Agreement. Indeed, the State did not attempt to demonstrate that it is in full or even substantial compliance with the Court's remedial orders as contemplated by provision XVIV, "Jurisdiction and Enforcement," of the Remedial Order. (*See* Remedial Order (D.E. 338) 54.) Based on the State's showing, the Court cannot find that its orders have been satisfied under Rule 60(b)(5).

The State has also failed to show that applying the Court's orders prospectively is no longer equitable. *See* Fed.R.Civ.P. 60(b)(5). The State submitted affidavits stating that the orders in this case require it to spend substantially more money providing services to Arlington class members than for identically situated non-class members with intellectual disabilities in the statewide waiver program. The testimony of Fred Hix, however, established that the State's study did not compare class members and non-class members with similar disabilities and ISP requirements. As Dr. Conroy testified, the State conducted an "apples to oranges" comparison in its cost study. The Court is therefore not persuaded by the State's showing that the remedial orders in this case create disparities in funding and care between class members and non-class members such that applying the orders prospectively is no longer equitable.

The crux of the State's argument is that the closure of Arlington and transition of the center's residents to new placements achieves the objectives of the Court's remedial orders and represents a durable remedy against future constitutional violations, satisfying the standards set forth in *Horne*. The Court agrees that Arlington's closure represents a significant milestone in this litigation, but is not convinced that the objective of its remedial orders, namely to protect the constitutional rights of class members, has been fully achieved and a durable remedy is in place. As the United States and People First point out, this litigation is the combination of two civil actions. Although the case arose from the unconstitutional violations found to have existed at Arlington, the Court included in the plaintiff class both residents of Arlington and those "at risk" of placement in Arlington. The remedial orders of this Court, including the orders agreed to by the State, have sought to ensure the constitutional rights of all class members, not just the rights of the residents of Arlington. The Court stated in its Order on Community Plan for West Tennessee (D.E. 753) that "it is beyond dispute that the protections of the Remedial Order extend to all members of the class." (*Id.* at 5.) The State now seeks to vacate the protections afforded "at-risk" class members, not because the constitutional rights of these class members have been vindicated, but because Arlington has closed. The closure of Arlington, however, does not end the State's obligation to class members in this action. Nevertheless, the State failed to present evidence regarding the steps it has taken to protect the rights of class members and ensure that those rights will be protected in the future.

Dr. Ray provided testimony that raises serious concerns about the care and services class members receive. The State may disagree about the conclusions Dr. Ray reached in her testimony and reports, but it did not provide fact or expert witness testimony to rebut Dr. Ray's contentions. As the Remedial Order contemplates, it is the Court Monitor's role to "conduct a review of the [State's] compliance" and report these findings to the Court. (Remedial Order 53 (setting forth the procedure for the State to petition the Court for termination of the Remedial Order).) If the State disagreed with Dr. Ray's assessments of its compliance with the Court's remedial orders, it could have presented testimony from its own fact witnesses and experts to support a finding of compliance. The State chose not to make such a showing despite the Court providing ample opportunity to do so.

One particular area of concern raised by Dr. Ray's testimony is the care class members in nursing homes receive. The State maintains that this evidence is not relevant to the Court's analysis because it is not responsible "for this state of affairs." (*See* Defs.' Closing Br. (D.E. 2867) 6.) The State ignores the mandate of this Court that it provide community placements for class members for whom such a placement is appropriate. The State is also required to ensure class members have legal conservators and independent support coordinators. The State cannot credibly claim that class members are residing in nursing facilities "voluntarily" when class members do not have legal conservators and independent support coordinators. That class members receive appropriate placements based on their individualized needs has long been a goal of this litigation (*see, e.g.*,

Remedial Order 42–47); the State has not demonstrated that this goal has been achieved. Moreover, the Court cannot find that a durable remedy is in place to ensure the appropriate placement of class members when class members lack legal conservators and independent support coordinators.

Dr. Ray's testimony also raised concerns about the frequency of dangerous and violent incidents occurring in community homes. Again, the State disagrees with the findings presented by Dr. Ray in her testimony and reports. The State, however, did not present any evidence to rebut Dr. Ray's findings and did not demonstrate that it has ensured class members in community placements are and will be reasonably free from harm. The lack of a streamlined and electronic incident reporting system is another concern. While the State appears to be taking steps to establish such a system (*see* Decl. of Scott J. Modell (D.E. 2819–3) at 2–3), the Court cannot conclude that the State has a durable remedy in place to ensure class member safety without an adequate reporting system in place.

The closure of Arlington and the transition of its residents to approved placements were contemplated by the parties at the time they executed the 2006 Settlement Agreement.[3] The State has fulfilled its obligation to close Arlington and transition the center's residents to appropriate settings, but now seeks relief from the remainder of its obligations under the 2006 Settlement Agreement. Under the standard articulated by the Supreme Court in *Rufo,* the State must meet a heavy burden to show that it agreed to the settlement in good faith, made a reasonable effort to comply with the settlement, and should be

---

**3.** "Whereas, the State has made the policy decision to close the Arlington Developmental Center and to provide services to persons currently residing in [Arlington] in a more integrated setting...." (2006 Settlement Agreement 1.)

relieved of the undertaking under Rule 60(b). 502 U.S. at 385, 112 S.Ct. 748. The State has not met this burden.

The State did not put forth any evidence regarding its reasonable efforts to comply with the terms of the 2006 Settlement Agreement. On the other hand, Dr. Ray's testimony raised questions about the State's good faith attempts to meet the requirements of the settlement. For instance, Dr. Ray testified that although she ultimately approved the location of the Arlington Woods Homes, she did so only after construction had begun. Dr. Ray's testimony and the aerial photograph admitted into evidence raises doubts as to whether the homes are truly interspersed in a residential neighborhood as required by the 2006 Settlement Agreement.

Dr. Ray also testified that many potential class members have not been enrolled in the class because of delays in the State's administration of PAEs. The Court need not decide for the purposes of ruling on the State's Motion whether a PAE is required under the 2006 Settlement Agreement for class membership. Under *Rufo,* the State has the burden to demonstrate it made a reasonable effort to comply with the settlement agreement. The Court cannot find that the State made a reasonable effort to enroll new class members as required by the parties' agreement when many potential class members were denied admission solely because a State agency failed to timely administer an examination the State insisted individuals undergo prior to class enrollment. The State offered no reasonable explanation as to why potential class members waited years to receive their PAEs.

Provision VI of the 2006 Settlement Agreement requires that "the community-based services currently provided be improved and be consistent with reasoned professional judgment and that the new community-based services made necessary by the closure of [Arlington] be effective, constitutional, and in compliance with statutory standards." (2006 Settlement Agreement 6.) The provision lists nine sub-parts setting forth specific requirements for the State to improve services for class members in community placements. Again, the State put forth no evidence that it has made a reasonable effort to comply with these requirements. The testimony of Dr. Ray, however, raises serious doubts about the State's compliance with these requirements.

The parties entered into the 2006 Settlement Agreement to resolve several contentious issues in this case, including the issue of defining the "at risk" class member criteria. The United States and People First entered into this agreement in good faith. The State, however, now seeks release from the terms of the agreement short of full compliance. The State has not carried its "heavy burden" under *Rufo* to demonstrate that such relief is warranted. The 2006 Settlement Agreement made clear that the closure of Arlington and transition of its residents to community placements would not end the State's responsibilities in this action. Indeed, the State agreed in the 2006 Settlement Agreement to take many additional steps to ensure the adequacy of the care class members receive, and the State has failed to articulate a compelling reason why it should not be held to the terms of its agreement.

The Court is mindful of the concerns raised by institutional reform litigations outlined by the Supreme Court in *Horne.* See 129 S.Ct. at 2593–95. As the Supreme Court noted, courts must take a "flexible approach" in recognition of these concerns. *See id.* at 2594. The Court has already vacated its orders relating to the conditions at Arlington in response to the cen-

ter's closure. (*See* D.E. 2724.) The Court Monitor, the United States, and People First all indicated that they believe the State can achieve compliance with the remaining orders of the Court within a period of one to two years. In addition, the United States and People First have indicated their willingness to engage in mediation with the State to develop an "exit criteria" to bring this case to a close. Indeed, the 2006 Settlement Agreement required the parties, in conjunction with the Court Monitor, "to enter into good faith discussions to develop objective and measurable exit criteria for the dismissal of this action." (2006 Settlement Agreement 13.) It appears that these discussions never occurred. The Court believes that taking a "flexible approach" to the outstanding issues in this litigation warrants mediation between the parties to develop "objective and measureable exit criteria" that will allow the State to demonstrate that the objective of the Court's orders has been achieved and a durable remedy is in place.

## IV. CONCLUSION

For the foregoing reasons, the State's Amended Motion to Vacate All Outstanding Orders and Dismiss the Case is DENIED. The parties are ordered within ninety (90) days of the entry of this Order to complete mediation with the Magistrate Judge to develop "objective and measurable exit criteria for the dismissal of this action." The first mediation session with the Magistrate Judge shall occur within thirty (30) days of entry of this Order and at other times as designated by the Magistrate Judge.

IT IS SO ORDERED.